INFORMATION DIGNITY ALLIANCE
Megan Keenan
Oregon State Bar No. 204657
*pro hac vice*
P.O. Box 8684
Portland, Oregon 97207
Phone: (925) 330-0359
Megan@InformationDignityAlliance.org

*Attorney for Plaintiff*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HILLARY WRIGHT,<br><br>Plaintiff,<br><br>v.<br><br>MAIL MEDIA INC., DMG MEDIA LTD, ASSOCIATED NEWSPAPERS LTD, DAILY MAIL AND GENERAL TRUST PLC.<br><br>Defendants. | Case No. 1:23-cv-07124-ALC<br><br>**FIRST AMENDED COMPLAINT**<br><br>*JURY TRIAL DEMANDED* |

Plaintiff Hillary Wright brings this action against Defendants Mail Media Incorporated, Associated Newspapers Limited, DMG Media Limited, and Daily Mail and General Trust PLC (collectively "Daily Mail") based upon personal knowledge, upon information and belief where applicable, and upon the investigation of counsel.

### I.    NATURE OF THE CASE

1.    This case brings claims under 17 U.S.C. § 501 for copyright infringement, 17 U.S.C. § 1201 of the Digital Millennium Copyright Act (DMCA) for the circumvention of

technological measures, and 17 U.S.C. § 1202 of DMCA for the removal of copyright management information. It is also about a case unfair competition under New York state law.

2.      Plaintiff worked as a photojournalist covering stories throughout the City of New York and posting them on her social media accounts to provide almost instantaneous coverage of the events she reported. Here, the Daily Mail copied Plaintiff's photo from social media platform that restrains copying content, removed Plaintiff's identifying information from the photo, and then published an unauthorized copy of her photo in its own news article. At no time did the Daily Mail contact Plaintiff about using her photo.

3.      The Daily Mail did not need Plaintiff's photo to report its news story because the Daily Mail sent its own photographer to the event where Plaintiff took the photo at issue. The Daily Mail's misuse of social media to copy a photojournalists' work for use in its own news articles hurts not only freelance photojournalists, but also its own photographers.

4.      Predatory behavior like this is antithetical to the point of copyright and disempowers all photographers. From freelance photojournalists to hired photographers, all photographers lose if news outlets can freely steal photos from social media without any repercussions. Freelance photojournalists won't get attribution or payment for their property, and news outlets won't have an incentive to pay their own photographers to cover stories. This behavior eviscerates the incentives for any photographer to cover and capture breaking news stories.

## II.    PARTIES TO THE CASE

5.      **Plaintiff**. Named Plaintiff Hillary Wright is an individual domiciled in, and a citizen of, the state of New York.

6.      **Defendants**. On information and belief, Mail Media Inc. ("Mail Media") is a corporation organized under the laws of Delaware with its principal place of business in the

Southern District of New York. On information and belief, Associated Newspaper Ltd ("Associated") is a limited private company organized under the laws of the United Kingdom with its principal place of business in the United States in the Southern District of New York. On information and belief Defendant DMG Media Ltd ("DMG") is a limited private company organized under the laws of the United Kingdom with its principal place of business in the United States in the Southern District of New York. On information and belief Defendant General Trust DMG Media Ltd ("DMT") is a public limited company organized under the laws of the United Kingdom with its principal place of business in the United States in the Southern District of New York.

### III.    JURISDICTION & VENUE

7.    **Subject-Matter Jurisdiction**.  This Court has subject-matter jurisdiction because the claims in suit involve federal questions as well as related state-law claims.

a.    *Federal-Question Jurisdiction*: Plaintiff's claims against Defendants for copyright infringement and removal of Copyright Management Information, and ANTI CRCUM arise under an act of Congress relating to copyrights, *i.e.*, under 17 U.S.C. § 101 et seq.  Therefore, this Court has exclusive subject-matter jurisdiction over these claims. See 28 U.S.C. §§ 1331 (federal-question jurisdiction), 1338(a) (exclusive jurisdiction over copyrights).

b.    *Supplemental Jurisdiction*: Plaintiff's New York common-law claims against Defendants are so related to the copyright claims against Defendants that they form part of the same case or controversy.  Therefore, this Court has supplemental jurisdiction over these claims. See 28 U.S.C. § 1367(a).

8.    **Personal Jurisdiction**.  On information and belief, Defendant Mail Media is domiciled in the State of New York. Therefore, Mail Media is subject to the jurisdiction of a court

of general jurisdiction in the State of New York.  N.Y. C.L.P.R. § 301 (authorizing the exercise of "jurisdiction over persons, property, or status as might have been exercised" on or before September 1, 1963); e.g., Rawstorne v. Maguire, 192 N.E. 294, 295 (N.Y. 1934) ("The courts of the State can obtain jurisdiction of the persons of those who are domiciled within the State[.]"). Upon service of summons or waiver thereof, this Court will have personal jurisdiction over Defendant Mail Media.  See Fed. R. Civ. P. 4(k)(1)(A).

9.      On information and belief, Associated, DMG, and  contracts substantial business within the state of New York. NY CPLR §302(a)(1) ("A court may exercise personal jurisdiction over any non-domiciliary […] who […] transacts any business within the state or contracts anywhere to supply goods or services in the state"). On information and belief, Associated, DMG, DMT, and Mail Media hire and retain employees, independent contractors, and agents in New York, New York. Associated, DMG, DMT, and Mail Media has its U.S. headquarters the state of New York. Associated, DMG, DMT, and Mail Media offer a website that is available in the State of New York. Associated, DMG, DMT, and Mail Media enter into contracts in the state of New York.

10.      Daily Mail Plaintiff's photo in the state of New York. Daily Mail wrote the article that contained the infringing copy in New York. Daily Mail published the infringing copy of Plaintiff's photo in the state of New York. And Daily Mail displayed the infringing copy of Plaintiff's photo on its website, which is accessible in the state of New York and accessed by people in the state of New York. NY CPLR §302(a)(2) ("A court may exercise personal jurisdiction over any non-domiciliary […] who […] commits a tortious act within the state).

11. In the alternative Plaintiff was injured within the state of New York. NY CPLR §302(a)(3) ("A court may exercise personal jurisdiction over any non-domiciliary […] who […] commits a tortious act without the state causing injury to person or property within the state).

12. **Venue**. A substantial part of the events and omissions giving rise to the claims occurred in this District. Therefore, this District is a proper venue. See 28 U.S.C. § 1391(b)(1)-(2).

13. **Intra-District Assignment**. None of the claims asserted herein arose in whole or in major part in the Northern Counties of this District. Likewise, none of the named Parties reside in the Northern Counties. Therefore, under this Court's Rules for the Division of Business Among District Judges, this case is appropriately assigned to Manhattan. See Rule 18(a)(3)(C) (Civil cases not meeting the criteria for assignment to White Plains under Rule 18(a)(3)(A)-(B) "shall be designated for assignment to Manhattan.").

## IV. STATEMENT OF FACTS

### A. Photojournalists in the Digital Age

14. Photojournalism uses photography as the medium to tell a story. Photojournalism has a rich history and many photojournalists have been at the forefront of breaking news stories from around the world. And in today's increasingly visual world, photojournalism has become a primary source of news for many people.

15. The democratization of social media has allowed photojournalists to capture news stories and instantaneously share their stories all over the world. Traditional news outlets aren't always able to work with that same speed. Thus, many people look to photojournalists social media accounts to stay up to date with breaking news stories as they unfold.

5

16.     Many photojournalists use social media as their portfolio of past work. Instead of sending photos to outlets, photojournalists can now post their portfolio to platforms like Instagram and share their previous work to potential licensees.   Social media accounts require photojournalists to create a username/handle. And these platforms provide photojournalists the ability to have contact information available on the platform. That way, consumers of photos and potential licensees can easily find the creator of, and copyright owner to, photos online. Further, these usernames and handles act as a source identifier for the photojournalists' products, i.e., their photos, to the consuming public.

17.     It is an industry norm to include an individual's social media handle in connection with displaying or otherwise using a work, like a photo, that was posted on a social media platform.

18.     Attribution of one's work is the key to a photojournalist's livelihood and craft as it keeps them tethered to their work and allows fans and potential licensees to find them.

19.     Being identifiable by one's username and handle is also a standard way for consumers to know where content originated from.

**B.  Plaintiff Worked as a Freelance Photojournalist Covering Protests.**

20.     The death of Mr. George Floyd at the hands of a Minneapolis police officer in May 2020 ignited protests all over the world. After his death, individuals gathered in cities all throughout the U.S. to protest issues of police brutality and racially motivated violence.

21.     As one of the most populous cities in the U.S., New York City was no exception. New York City was a hot bed for protests after the murder of Mr. Floyd.

22.     Starting on or around June 2020 and ending on or around 2021, Plaintiff worked as a full-time freelance photojournalist. Plaintiff holds a B.A. in journalism from the University of Oklahoma and an M.S. in Applied Anatomy and Physiology from Columbia University. She

has prior professional experience as a writer, media creator, media platform operator, speaker, and educator. Plaintiff took her experience and began covering protests all throughout New York City.

23.    Plaintiff posted her news coverage and photos on various social media platforms, but primarily Instagram and X, formerly known as Twitter.

24.    For the entirety of Plaintiff's time as a freelance journalist covering the protests in New York, Plaintiff posted on Instagram using the username/handle @HillaryWright.

25.    For the entirety of Plaintiff's time as a freelance journalist covering the protests in New York, Plaintiff posted on X, formerly known as Twitter, under the username/handle @HillaryWright.

26.    Plaintiff's Instagram handle conveyed identifying information about Plaintiff as the copyright holder of the photos and content that she posted.

27.    Plaintiff's Instagram handle conveyed a link to Plaintiff's Instagram profile which contained Plaintiff's full name and email.

28.    On information and belief, Instagram allows users to post their own photos on its platform. But, it also restrains its users freedom or ability to access the location where downloadable files are stored and download them.

29.    On information and belief, X, formerly known as Twitter, allows users to post their own photos on its platform. But, it also restrains its users freedom or ability to access the location where downloadable files are stored and download them.

30.    On information and belief, Instagram implements at least one, if not more, design restraint to prohibit users from downloading other users' files. One such restraint includes Instagram's website and app code that restrains a user from downloading the other users' files.

31.     On information and belief, X, formerly known as Twitter, implements at least one, if not more, design restraint to prohibit users from downloading other users' files. One such restraint includes X's website and app code that restrains a user from downloading the other users' files.

32.     During her time as a freelance journalist, Plaintiff set up her Instagram account so that it was public and that anyone who visited her Instagram page could see her photos. Further anyone that visited Plaintiff's Instagram page could click on a contact button that included Plaintiff's email address. And, if the viewer was also an Instagram user, they could message Plaintiff directly through the platform.

33.     Plaintiff broke a number of protest-related stories. Plaintiff was one of the first to report about a practice of the NYPD to strip-search women in public during arrests.

34.     Plaintiff worked throughout New York City to capture breaking news stories that she shared with the world using her social media profiles including Instagram and X, formerly known as Twitter.  At the peak of her reporting, Plaintiff had over 8,000 followers on Instagram.

35.     Plaintiff's stories were routinely shared by other social media users who had anywhere from 10,000-100,000 followers.

36.     A variety of media outlets contacted Plaintiff about her coverage of protest-related events. These outlets included national and local outlets like the New York Times, CBS, NBC, ABC, and Pix11.

37.     For example, NBC sent Plaintiff a direct message through Instagram requesting a license to use a video Plaintiff posted on X, formerly known as Twitter. In its offer, NBC included to give credit to Plaintiff.

8

38.     In some instances, but not all, Plaintiff agreed to license her work to other media outlets.

39.     Plaintiff's name became associated with her photos and news stories. Plaintiff had obtained goodwill that attached to the content that she created.

### C. Plaintiff's Original Photo.

40.     On December 11, 2020, Plaintiff covered a protest in Manhattan. At that protest, a woman named Kathleen Casillo drove her car through a group of protestors and injured many of them as a result (the "Incident").

41.     Plaintiff reported on her Instagram and X, formerly known as Twitter, about the Incident.

42.     After the Incident, Plaintiff covered Ms. Casillo's criminal case that related to the Incident. Plaintiff posted multiple stories related to the Incident and the criminal case that followed.

43.     On, December 1st, 2021, Plaintiff, covered a protest outside of the courthouse where victims and supporters of victims gathered to await Ms. Casillo's charges (the "Event). At the Event, one individual held a sign that read "Kathleen Casillo is the new Kyle Rittnehouse[.]" The sign referenced Kyle Rittenhouse, a man who shot Black Lives Matter protestors. His court date was weeks before Ms. Casillo's.

44.     As part of Plaintiff's reporting, Plaintiff attended the Event, took photos of the Event, and wrote about the Event.

45.     One photo in particular embodied the narrative of the protestors that day. Plaintiff took a picture, using her iPhone, of a protestor holding a sign that read "Kathleen Casillo is the new Kyle Rittnehouse" (the "Sign"). Plaintiff made the decision to frame the photo so that the

Sign was the focal point of the photograph. Plaintiff chose to have the Sign take up most of the space in the frame. Plaintiff took the photo at a downward angle. Plaintiff framed the photo so that it didn't include the face of the individual that held the Sign. Plaintiff framed the photo so that multiple legs and feet can be seen in the background, conveying that there was a crowd gathered without capturing individual faces in the crowd.



(the "Photo").

    46.    Plaintiff is the author of the Photo and has at all times been the sole owner of all right, title and interest in and to the Photo, including the copyright thereto.

    47.    On or around December 1st, 2021, around 11am eastern, Plaintiff posted a copy of the Photo to her Instagram to report on the Event. Plaintiff posted the Photo and the same report on X, formerly known as Twitter.

    48.    After posting the Photo, a media outlet named People's Media NYC, promptly reached out to Plaintiff to request authorization to reproduce and distribute the Photo on its own

social media pages. Plaintiff authorized People's Media NYC to distribute a copy of Plaintiff's Photo.

49.     Media outlets are the traditional and reasonable market for Plaintiff to license her Photo.

50.     The Photo was originally posted on her Instagram under her handle @HillaryWright. Plaintiff's Instagram handle is Plaintiff's first and last name.

51.     Plaintiff's Instagram handle, @HillaryWright, was clearly displayed directly above the Photo. Plaintiff's Instagram handle, @HillaryWright, was clearly displayed below the photo before the text that made up Plaintiff's coverage of the Event.

52.     Plaintiff's Instagram handle, @HillaryWright, helped identify Plaintiff as the copyright holder, author, and originator of the creative work.

53.     Plaintiff's Instagram post was re-posted, or shared, on Instagram and X, formerly known as Twitter, thousands of times after she posted it. Some of these re-posts were made by users who had anywhere from 10,000-100,000 followers.

54.     Plaintiff registered the photo with the U.S. Copyright Office, registration number VA 2-293-166.

### D. The Daily Mail is an Established News Outlet.

55.     Daily Mail is made up of several for-profit companies. On information and belief Mail Media, Associated, and DMG are all involved in the day-to-day operations of running the Website.

56.     On information and belief Mail Media, Associated, and DMG have employees, independent contractors, and or agents that are involved in the day-to-day operations of the Website.

57.     On information and belief Mail Media, Associated, and DMG have a U.S. headquarters and office located at 51 Astor Place, 9th Floor, New York, NY, 10003 (the "New York Office").

58.     On information and belief Mail Media, Associated, DMG, and DMT each have substantial operations throughout the Southern District of New York.

59.      On information and belief Mail Media, Associated, DMT, and DMG have employees, independent contractors, and or agents that are present the New York Office.

60.     On information and belief Mail Media, Associated, DMT, and DMG are signatories to contracts that are related to the day-to-day operations of the Website.

61.     Daily Mail publishes news content online at www.dailymail.co.uk  and holds itself out as the "most widely-read newspaper website in the world" (the "Website").

62.     Daily Mail dedicates an entire section to stories originating in, or relating to, the United States, www.dailymail.co.uk/ushome. On information and belief, most of the content in this section originates out of the New York Office.

63.     On information and belief, Daily Mail directly and indirectly derives revenue from the articles that it posts on its Website.

64.     On information and belief, Daily Mail publishes new articles every day. Most, if not all, of the Daily Mail's articles posted on the Website include a photograph or video.

65.     On information and belief, Daily Mail produces printed physical versions of articles available on its Website and distributes those hard copies for re-sale or direct-to-consumers.

66.    On information and belief, the Daily Mail employs and/or contracts with photographers regularly. These photographers provide original photos for Daily Mail to use on its Website.

67.    On information and belief, Daily Mail regularly licenses photos from photographers, individuals, or other companies.

68.    Daily Mail regularly pays licensing fees to use photographs or videos on its Website.

69.    Daily Mail's website advertises that it offers cash for video footage:



70.    On information and belief, Daily Mail is knowledgeable about licensing photographs.

71.    On information and belief, Daily Mail has employees or agents that are knowledgeable in U.S. copyright law. These employees or agents advise Daily Mail and agents of the Daily Mail on how to comply with U.S. copyright law.

72.    On information and belief, Daily Mail has employees or agents that are knowledgeable in licensing matters. These employees or agents advise Daily Mail and agents of the Daily Mail on how to properly license creative works.

73.    Daily Mail regularly includes the name of a photographer or the source of a photo at the bottom of a photo, what's known in the industry as a gutter credit, on photos it includes on its Website.

74.    On information and belief, Daily Mail regularly does not include gutter credits on photos that it owns or retains the copyright to.

### E.    Daily Mail's Article and Unauthorized Copying of Plaintiff's Photo.

75.    Daily Mail covered many of the same events as Plaintiff. Daily Mail published articles about these events on its Website.

76.    On or around December 1st, 2021, Daily Mail published a story on its Website called "BLM mob accuses white mother-of-three, 52, of being the 'new Kyle Rittenhouse' after she sent 50 of them flying across Third Avenue when they 'attacked her car' during 2020 protests: She rejects six-day community service plea deal and demands TRIAL" (the "Article").

77.    An archived link of the Article as published with Plaintiff's Photo can be found at https://archive.md/kCvhP.

78.    On information and belief, Daily Mail had an agent cover the Event on its behalf. Daily Mail had an agent take photos of the Event on its behalf. That person attended the Event, took photos for the Article, and provided photos to Daily Mail and or its agent.

79.    Daily Mail assigned Curtis Means to take photos of the Event on its behalf. Curtis Means attended the Event, took photos for the Website, and provided photos to Daily Mail.

80.     On information and belief, Daily Mail's agent took photos that had the Sign visible in the photographs.

81.     On information and belief Daily Mail had access to photos taken by its agent, or someone authorized to take photos on Daily Mail's behalf, that included the Sign. Daily Mail or its agent decided not to use any of those photos.

82.     On information and belief Daily Mail had access to photos taken by Curtis Means that included the Sign. Daily Mail or its agent decided not to use any of those photos.

83.     On information and belief an agent of the Daily Mail researched additional photos to include in the Article about the Event.

84.     Daily Mail or its agent, licensed additional photos to include in the Article.

85.     On information and belief, the person assigned to cover the Event, or a different agent of the Daily Mail, wanted a photo that captured the Sign as a prominent feature of a photo.

86.     On information and belief, an agent for Daily Mail searched for a photo that better showcased the Sign. An agent for the Daily Mail found Plaintiff's Photo on social media and copied the Photo.

87.     Daily Mail or its agent copied Plaintiff's Photo in its entirety.

88.     On information and belief, Daily Mail or its Agent downloaded a copy of the Photo and saved it to an internal drive that is accessible by Daily Mail or its agents.

89.     On information and belief Daily Mail or its agent circumvented the measure put in place by Instagram that restrains users from downloading files from its platform.

90.     On information and belief Daily Mail or its agent circumvented the measure put in place by X, formerly known as Twitter, that restrains users from downloading files from its platform.

91.     On Information and belief, Daily Mail or its agent, used a technology available to download or otherwise make a copy of the Photo, despite Instagram and X's technologic measures put in place to restrain users from downloading files uploaded to each platform.

92.     Daily Mail did not license the Photo from Plaintiff for the Article, nor did Daily Mail have Plaintiff's permission or consent to publish the Photo on its Website.

93.     Daily Mail, or its agent, removed Plaintiff's Instagram handle from the Article and its Website. Daily Mail or its agent did not have authority from Plaintiff to do so.

94.      Daily Mail, or its agent, removed Plaintiff's name from the Article and its Website. Daily Mail or its agent did not have authority from Plaintiff to do so.

95.     Upon information and belief, Daily Mail, or its agent, removed Plaintiff's Instagram handle from the Photo. Daily Mail or its agent did not have authority from Plaintiff to do so.

96.     Upon information and belief, Daily Mail, or its agent, removed Plaintiff's name from the Photo. Daily Mail or its agent did not have authority from Plaintiff to do so.

97.     Daily Mail, or its agent, removed Plaintiff's Instagram handle and her name to conceal its unauthorized copying of Plaintiff's Photo.

98.     Every photo included in the Article, except Plaintiff's Photo, had a gutter credit that identified the copyright owner, author, or other identifying information about the owner of the work.  Plaintiff's Photo had no gutter credit associated with it in the Article.

99.     Daily Mail included photos in the Article that contained the following gutter credits:

a.  © Steven Hirsch/POOL

b.  © Curtis Means for DailyMail.com

    c.  © Getty Images

    d.  © VIA REUTERS

    e.  © AFP via Getty Images

    f.  © Peter Gerber

    g.  © AP

100.    On information or belief, Daily Mail did not put a gutter credit on Plaintiff's Photo within the Article in an attempt to pass the Photo off as its own photo. Consumers of the Article and photos contained therein were likely confused as to the source of the Photo. And consumers who were aware that the Photo originated from Plaintiff believed that Ms. Wright sponsored Daily Mail's use of the Photo. Such sponsorship or affiliation would hurt the goodwill of Plaintiff.

101.    On information and belief, other media outlets obtained a copy of Plaintiff's Photo from the Article and used her Photo without her authorization.

102.    On information and belief, Daily Mail's use of the Photo competed with Plaintiff's use of the Photo. It limited her ability to license it to others. And people who liked the Photo went to Daily Mail as the source of the Photo and not Plaintiff.

103.    In its Article, Daily Mail used the Photo for the same purpose as Plaintiff used the photo in her report. The purpose was to report on the Event.

104.    The Article did not comment on Plaintiff's report that accompanied the Photo.

105.    The Article did not criticize Plaintiff's report that accompanied the Photo.

106.    The Article did not comment on Plaintiff's Photo.

107.    The Article did not criticize Plaintiff's Photo.

108.    Daily Mail used the Photo as an illustrative aid to describe the Event.

109.    Plaintiff used the Photo as an illustrative aid to describe the Event.

110.    Plaintiff's Photo was no more newsworthy than the photograph of the Sign that, on information and belief, Daily Mail and its agents had the lawful right to use.

111.    Plaintiff's creative expression of the Sign was the reason why Daily Mail and its agents wanted to use the Photo.

112.    Daily Mail could have published its article without using Plaintiff's Photo. Daily Mail had no need to use Plaintiff's photo.

113.    Defendant Distributed the Photo through its Website.

114.    Daily Mail knew that the CMI was removed from the Photo without the authority or consent of Plaintiff.

115.    Daily Mail knew or had reasonable grounds to know that its distribution of the Photo would induce, enable, facilitate, or conceal downstream infringement.

116.    Daily Mail k knew or had reasonable grounds to know that people or companies would copy the Photo from their article and further infringe on Plaintiff's rights.

117.    Daily Mail knew or had reasonable grounds to know that its distribution of the Photo would induce, enable, facilitate, or conceal its own infringement.

## V.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION:
### COPYRIGHT INFRINGEMENT

118.    Plaintiff incorporates by reference each and every allegation contained in Paragraphs 1-117 above.

119.    **Ownership of a Valid Copyright**. Ms. Wright is the author of the Photo. Ms. Wright has not transferred ownership rights in the Photo.

18

120.    **Copying of an Unlawful Amount**. Daily Mail, without authorization, reproduced, publicly displayed, and publicly distributed the Photo. Daily Mail is not, and has never been, licensed or otherwise authorized to reproduce, publicly display, distribute and/or use the Photo.

SECOND CAUSE OF ACTION:
REMOVAL OF COPYRIGHT MANAGEMENT INFORMATION

121.    Plaintiff incorporates by reference each and every allegation contained in Paragraphs 1-117 above.

122.    **Existence of CMI in connection with a copyrighted work**. Plaintiff's Instagram handle was displayed directly above and below the Photo as posted on Instagram. Plaintiff's Twitter handle was displayed directly about the Photo as posted in X, formerly known as Twitter. Plaintiff's handle on Instagram and X was her full name, @HillaryWright.

123.    **Daily Mail distributed the Photo**. Daily Mail reproduced the Photo and distributed it in the Article on its Website.

124.    **Daily Mail Knew that CMI had been removed without Plaintiff's Consent**. The Daily Mail, or its agent, reproduced the photo and removed Plaintiff's Instagram and or X handle. Daily Mail or its agent had a gutter credit for every photo in the Article except for Plaintiff's Photo.

125.    **Daily Mail Knew or had reasonable grounds to know that its distribution of Plaintiff's Photo would Enable, Facilitate, or Conceal an Infringement**. Daily Mail's distribution of Plaintiff's photo concealed its own infringing act. Further, because Daily Mail is such an established media outlet, it should know that its distribution of infringing material would enable and facilitate others to infringe on Plaintiff's Photo.

<u>THIRD CAUSE OF ACTION:</u>
<u>CIRCUMVENTION OF TECHNOLOGICAL MEASURES</u>

126.    Plaintiff incorporates by reference each and every allegation contained in Paragraphs 1-117 above.

127.    **A Technological Measure Controls Access**. The Photo was published on Plaintiff's Instagram and X, formerly known as Twitter. On information and belief, both platforms have technological measures written into the app and website code that restrain users from downloading content uploaded by other users. And, both platforms restrain its users' freedom or ability to access the location where downloadable files are stored by the platform and download them.

128.    **Circumvention of that Technical Measure**. On information and belief, Daily Mail or its agent, bypassed the measures put in place by either Instagram and or Twitter to obtain an unauthorized copy of Plaintiff's Photo. Daily Mail or its agent bypassed Instagram and X's technological measure to download a copy of Plaintiff's photo from either or both platforms.

<u>FOURTH CAUSE OF ACTION:</u>
<u>UNFAIR COMPETITION UNDER NEW YORK COMMON LAW</u>

129.    Plaintiff incorporates by reference each and every allegation contained in Paragraphs 1-117 above.

130.    Daily Mail engaged in unfair competition against Plaintiff.

131.    Daily Mail took Plaintiff's Photo and used it in a manner that competed with Plaintiff. Daily Mail's manner and use of the Photo is likely to confuse the public origin and sponsorship.

132.    Daily Mail's is likely to deceive the public into believing that Plaintiff authorized, sponsored, endorsed or affiliated the Daily Mail which violates Plaintiff's goodwill.

133.    Daily Mail did not provide attribution to Plaintiff in connection with the Photo.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Hillary Wright prays for judgment in its favor and against Daily Mail, and

further prays for judgment in its favor, seeking any and all relief permitted, including:

I.        **Money Damages, Costs, and Fees:** That the Court, if permitted, money damages

      a.        Award Ms. Wright damages as against Daily Mail.

      b.        Award Ms. Wright full recovery of costs as against Daily Mail.

      c.        Award Ms. Wright reasonable attorneys' fees as against Daily Mail.

II.        **Injunctive Relief**: That the Court, if permitted and where necessary to provide a

remedy where money damages cannot adequately and sufficiently compensate Ms. Wright:

      a.        Grant a preliminary and a permanent injunction preventing and restraining

Daily Mail.

III.        **Other Relief:** That the Court, if permitted,

      a.    Grant any other relief permitted by law.

## VII.    JURY DEMAND

      c.        Plaintiff Hillary Wright hereby demands a trial by jury of all issues so triable.  <u>See</u>

Fed. R. Civ. P. 39: U.S. Const. amend. VII.

Dated: June 4, 2024

                    Respectfully submitted,

                    <u>/s/ *Megan Keenan*            </u>
                    Megan Keenan
                    Oregon State Bar No. 204657
                    P.O. Box 8684
                    Portland, OR 97207
                    Phone: (925) 330-0359
                    Megan@InformationDignityAlliance.org

                    *Attorney for Plaintiff*